IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

   Plaintiff,

   v.                                                  Case No. 2:21-cr-20059-HLT

DAVONTE LARON CHANEY,

   Defendant.

## MEMORANDUM AND ORDER

Defendant Davonte Chaney moves to suppress evidence and statements obtained during the execution of two search warrants. Doc. 28. He argues that (1) the affidavits supporting the search warrants included knowing or reckless misstatements and omissions that would have altered each magistrate judge's probable cause determination and (2) the search warrants were not supported by probable cause. The Court finds that there were no knowing or reckless misstatements or omissions, that any misstatements or omissions were not material, and that the search warrants were supported by probable cause. The Court thus denies the motion.

I.   **BACKGROUND**[1]

An armed man entered the Truity Credit Union at 2221 W. 31st Street in Lawrence, Kansas, at approximately 9:37 a.m. on September 21, 2021. The gunman pointed a black pistol at the employees, and the employees got on the ground. He handed a white grocery sack to an employee, and the employee started putting money in the bag. The employee placed $6,087.35 in the sack,

---

[1] The Court heard testimony from LPD Detective Kimberly Nicholson and LPD Detective/FBI TFO Ryan Padilla during the February 16, 2022 hearing. Based on each witness's demeanor and attentiveness during questioning—and given that, at times, each conceded facts not helpful to the government's case—the Court credits the entirety of their testimony. Nicholson's testimony was extremely credible given her knowledge of the subject matter, her candor, and her demeanor. But the Court relays only those portions of their testimony relevant to its resolution of the motion. The Court also admitted Government Exhibits 3-4 and Defense Exhibits A-C.

which included six $20 bait bills. The gunman then left the credit union on foot, and an employee sounded an alarm.

Lawrence Police Department ("LPD") investigators responded to the scene. LPD Detective Kimberly Nicholson then began reviewing video surveillance footage from Truity and surrounding businesses to identify the robbery suspect. Video from inside Truity showed the robbery suspect entered the building at approximately 9:37 a.m. The robbery suspect was wearing a black hooded sweatshirt pulled tight around his face, a black face mask, black sweatpants with red shorts or pants underneath, black Nike Air Foamposite shoes with an orange "swoosh" and gray/white speckled soles, and light-colored gloves. Witnesses described the robbery suspect as a black male, approximately 25-30 years old, taller than 6 feet, with an average build of approximately 200 pounds.

The robbery suspect left Truity at approximately 9:39 a.m. Video from Truity's external cameras showed the robbery suspect exit the credit union, walk around the front of the building, and then run to the southwest. The robbery suspect continued running across an empty field towards a path that leads directly into a gap in a fence in the northeast corner of The Reserve apartment complex at 2511 W. 31st Street. Nicholson believed that the robbery suspect likely came from the same pathway before the robbery.

Nicholson then began reviewing video surveillance footage from before the robbery. At approximately 9:06 a.m., a subject dressed in black emerged from the northeast corner of The Reserve and walked eastbound through the field behind Truity.[2] The subject turned around and walked back west to The Reserve, before turning around again to walk back east toward two

---

[2] The subject was too far away from the camera to make out any specifically identifying features or characteristics. But Nicholson testified that she believed the subject and the robbery suspect are the same individual based on witness statements and movements captured on the video surveillance footage in the area over the next 35 minutes. The Court agrees after reviewing the record.

2

businesses just southeast of Truity. At approximately 9:29 a.m., the robbery suspect is captured on video surveillance entering the Truity parking lot, attempting to open the back door of a white Nissan Rogue, and then walking east towards Casey's and out of view. At approximately 9:37 a.m., the robbery suspect is observed on video again as he approached Truity from the east and entered the credit union. Having concluded that the robbery suspect walked from The Reserve to Truity, and then back to The Reserve after the robbery, Nicholson began focusing her attention on vehicles entering and exiting the apartment complex before and after the robbery.

The Reserve has two entrances. The "main" entrance is accessed off 31st Street and is in the northwest corner of the apartment complex. It has a roundabout shortly after entry. Near the roundabout is The Reserve's sign, leasing office, future resident parking, and clubhouse. The clubhouse has a security camera. The camera's video footage includes a timestamp that is approximately two hours and six minutes behind real time. The second entrance is in the southeast corner of the complex. This entrance is accessed via 33rd Street, which is a dead-end road that ends at The Reserve. The Reserve does not have a camera facing this second entrance. But video surveillance footage from the southeast corner of Target's roof captures vehicles traveling on 33rd Street. Because 33rd Street is a dead-end west of Target, no vehicles can enter or exit The Reserve's second entrance without passing the Target camera.

Nicholson watched Target's video surveillance footage and wrote down the color and possible make and model of every vehicle that could have entered or exited The Reserve's southeast entrance in the approximately two hours before the robbery. Nicholson did not identify any vehicles that traveled west on 33rd Street (toward the second entrance) before the robbery and then to the east on 33rd Street (away from the second entrance) after the robbery. Nicholson thus concluded that this entrance was not involved in the robbery.

3

Nicholson then watched footage from The Reserve's main entrance and again wrote down every vehicle that entered or exited from approximately 7:00 a.m. until after the robbery. Nicholson observed a dark gray Pontiac Grand Prix enter the complex from 31st Street at approximately 9:03 a.m. and continue east around the roundabout out of camera view. The Pontiac had dark tinted windows, five spoke star rims, a short spoiler on the trunk, and a sunroof. Nicholson referenced Truity's external video surveillance footage, which captured vehicles driving on the eastern side of the apartment complex. Nicholson did not see the Pontiac travel south of the northeast corner of the complex, leading her to conclude that the Pontiac was parked in the northeast corner of The Reserve during the robbery.

Nicholson next observed the Pontiac on The Reserve's video surveillance footage at approximately 9:41 a.m., two minutes after the robbery suspect left Truity on foot running towards the northeastern corner of The Reserve. The Pontiac was captured driving from the northeast corner of the complex, going past the roundabout, and exiting onto 31st Street.

Nicholson then tracked the Pontiac's movements before and after the robbery. Nicholson reviewed footage from traffic cameras throughout Lawrence on the day of the robbery. Nicholson was able to back-track the Pontiac to when it first appeared in Lawrence at approximately 8:27 a.m. on September 21 at the intersection of W. 2nd Street and McDonald Drive. At approximately 8:40 a.m., Nicholson observed the Pontiac pull into The Reserve's 31st Street entrance, go around the roundabout, and exit back onto 31st Street. Between 8:40 and 9:03 a.m., Nicholson was generally able to track the Pontiac driving around the business district where Truity is located.

At one point the Pontiac left camera view when it entered a parking lot to the southeast of Truity. Nicholson then observed a subject in all dark clothing walking on the road in front of Target before returning to the area of the parking lot. The Pontiac is then seen traveling from the parking

4

lot to The Reserve's main entrance. And after the robbery, Nicholson was able to track the Pontiac across Lawrence until exiting the city at approximately 10:05 a.m. when it turned onto the Kansas Turnpike. Nicholson also reviewed surveillance footage from Truity from September 20 (the day before the robbery), which showed the Pontiac circling the area around Truity.

Nicholson then used the automated license plate reader at the W. 2nd Street and McDonald Drive intersection to discover the Pontiac was bearing license plate 171NPE. Nicholson ran the license plate through Kansas State Files and learned it was registered to Davonte Laron Chaney, 3010 N. 76th Street, Kansas City, Kansas, 66109. Nicholson then obtained Chaney's photograph and descriptors and learned that he was a 29-year-old black male, 6'1" tall and 180 pounds, which generally matched the robbery suspect's appearance. Nicholson shared the findings of her investigation with other investigators.

Investigators learned that Chaney listed 3010 N. 76th Street as his home address in August 2021. The address was given as his residence in an unemployment claim filed by Chaney as well as in an active tax warrant. On September 28, investigators located the dark gray Pontiac Grand Prix with license plate 171NPE parked at that residence. Investigators observed Chaney leave the residence, get in the Pontiac, drive to a store, and drive back to the residence.

Later that same day, LPD Detective/FBI TFO Ryan Padilla applied for search warrants for the Pontiac and the 3010 N. 76th Street residence. *See United States v. 3010 North 76th Street, Kansas City, Kansas 66109*, No. 2:21-mj-08205-JPO, Doc. 1 (D. Kan. 2021); *United States v. 2004 Pontiac Grand Prix*, No. 2:21-mj-08206-TJJ, Doc. 1 (D. Kan. 2021). Padilla's affidavits are nearly identical and state that "[b]ased on the descriptors provided by bank employees being similar to Mr. Chaney, Mr. Chaney's vehicle seen circling the bank prior to the robbery, a subject dressed in all black clothing seen walking to and from the Pontiac prior to the robbery, and the

5

Pontiac being in the area of The Reserve at the same time the robbery suspect is seen there, Affiant believes the [Pontiac] is related to the credit union robbery." *Id*. at 13. Padilla stated in his affidavits that he believed "evidence pertaining to the robbery of Truity Credit Union is located inside the Pontiac Grand Prix and the residence of 3010 N. 76th Street, Kansas City, Kansas."

A federal magistrate judge approved each search warrant. The search warrants authorized officers to search for and seize evidence related to the robbery. This included a black hooded Ralph Lauren sweatshirt, a pair of black and gray men's joggers, any/all black handguns, U.S. currency including currency bearing the serial numbers of the six bait bills, black/orange/gray Nike Air Foamposite shoes, red men's shorts or pants, light colored gloves, black face mask, Wal-Mart grocery sack, and paperwork for the Pontiac and the 3010 N. 76th Street residence.

The FBI executed the search warrants and located Chaney in the Pontiac. The FBI then secured the vehicle and the residence. Inside the residence, investigators located and seized a black Glock 9mm handgun, various articles of clothing, and approximately $1,888.00 of currency. The currency included the six bait bills from the robbery. A grand jury later indicted Chaney for bank robbery and use of a firearm in furtherance of a crime of violence. Chaney now moves to suppress all evidence obtained from the search warrants.

## II.     ANALYSIS

Chaney raises two broad arguments in his motion to suppress: (1) the search warrant affidavits included knowing or reckless misstatements and omissions that would have altered each magistrate judge's probable cause determination (i.e., the *Franks* Issue), and (2) the search warrants were not supported by probable cause (i.e., the Probable Cause Issue). The Court addresses each below.

A.     *Franks* Issue

Chaney first argues that search warrant affidavits included knowing or reckless misstatements and omissions that altered each magistrate judge's probable cause determination. This argument stems from the Supreme Court's opinion in *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In that case, the Supreme Court explained that:

> where the defendant makes a substantial preliminary showing that a false statement knowingly, or with reckless disregard for the truth, was included by the affiant, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if the probable cause was lacking on the face of the warrant.

*Id.* at 155-56. Thus, a defendant gets relief under *Franks* by showing by a preponderance of the evidence that (1) an affidavit contains a knowing or reckless misstatement or omission that (2) is material to issuance of the warrant. *Id.*; *see also United States v. Moses*, 965 F.3d 1106, 1110 (10th Cir. 2020).[3]

The Court first analyzes the affidavits. The affidavits state that a subject wearing all black clothing was captured on security camera footage at 9:06 a.m. when he emerged from the northeast corner of The Reserve and walked eastbound through a field behind Truity. The robbery suspect is captured on various cameras walking in the area around Truity between 9:21 and 9:37 a.m. when

---

[3] The government argues that Chaney has failed to make the initial showing that would entitle him to a *Franks* hearing. But because the Court was already hearing evidence on the other issues raised in the motion to suppress, it opted to hear evidence on the *Franks* issue as well, which is within its discretion to do. *See United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015) ("Nothing in [*Franks*] or the logic on which it rests suggests a district court must forswear an evidentiary hearing unless the defendant's motion makes one constitutionally compulsory.").

he entered Truity. He is then captured at 9:39 a.m. exiting Truity, walking around the building, and then running towards a path that leads directly into the northeast corner of The Reserve.

The affidavits then state:

> 17. After observing the suspect come from and leave towards The Reserve, LPD Detective Nicholson reviewed <u>video surveillance from the entrance of The Reserve</u>. Detective Nicholson observed <u>at approximately 9:03 a.m., a dark gray Pontiac Grand Prix pulls into the entrance</u> of The Reserve and travels eastbound around the roundabout. Detective Nicholson noted on the Truity Credit Union video surveillance that the northeast corner of The Reserve was visible and any vehicles driving past could be seen. Detective Nicholson noted the dark gray Pontiac was never seen traveling south of the northeast corner of the complex.
>
> 18. <u>Detective Nicholson next sees the Pontiac at approximately 9:41 a.m., a minute after the suspect was seen running towards The Reserve, coming from the northeast corner and exiting the complex</u>. Detective Nicholson also reviewed video surveillance from earlier in the morning and observed the Pontiac pull into the round-about and then immediately exit the complex at approximately 8:40 a.m. Detective Nicholson noted the dark gray Pontiac had dark tinted windows, 5 spoke star rims, a short spoiler on the trunk, and a sunroof.
>
> 19. Detective <u>Nicholson was then able to track the Pontiac</u> based on the distinct features of the vehicle and the time frame it was seen on The Reserve video. Detective Nicholson reviewed video surveillance from Casey's and Target and captured the Pontiac multiple times in the area prior to the robbery. Detective Nicholson first sees the Pontiac at approximately 8:39 a.m. traveling northbound on the frontage road of Target coming from W. 33rd Street and then turning westbound onto W. 31st Street.
>
> 20. <u>Detective Nicholson sees the Pontiac again at approximately 8:44 a.m. turning southbound onto Neider Road from traveling eastbound on W. 33rd Street</u>. Detective Nicholson tracks the Pontiac as it pulls into the parking lot area of Great Clips, 3140 Iowa Street, and out of camera view. After the Pontiac leaves camera view, Detective Nicholson observes a subject in all black clothing walking northbound on the frontage road of Target. The subject can be seen walking to the area of Mass Street Beverage and then cutting back across the Target parking lot towards the parking lot of Great Clips. A few moments after the suspect is out of camera view in the Great

> Clips parking lot, Detective Nicholson observes the Pontiac traveling northbound on the frontage road at approximately 9:03 a.m.

Doc. 1 at 7-8 (emphasis added).

Chaney contends these affidavits contain three critical problems: (1) they flagrantly obscured the fact that The Reserve has a second entrance, (2) they misleadingly stated that Nicholson could view the Pontiac at several locations near the robbery before the robbery began, and (3) they intentionally omitted the fact that a second car pulled into The Reserve shortly before a subject was seen walking between the apartment complex and the business area. Chaney argues that these misstatements and omissions were knowing or reckless and that a magistrate judge would not have found probable cause had the additional or corrected information been disclosed. To resolve this argument the Court must initially determine whether Padilla (the affiant) knowingly or recklessly misstated or omitted the challenged information and, if so, must next determine whether a magistrate judge would have found probable cause had the additional or corrected information been disclosed.

### 1. Knowing or Reckless Misstatements or Omissions

#### a. Second Entrance

Chaney argues that the affidavits knowingly or recklessly omitted that there was a second entrance to The Reserve that is not monitored by video surveillance. Chaney contends this gave each magistrate judge the false impression that there was only one entrance to The Reserve and that the Pontiac was the only vehicle that could have entered and exited the apartment complex near in time to the robbery. The Court disagrees.

Here, there is no evidence to suggest that Padilla's reference to "the entrance" was knowingly false or made with reckless disregard for the truth. Padilla testified that he was aware of the second entrance off 33rd Street and he admitted that he could have been more specific in his

9

affidavits. But Padilla testified that he did not intend to mislead a magistrate judge. Padilla explained that he did not believe the existence of a second entrance was relevant because there were no facts uncovered during the investigation that implicated the 33rd Street entrance. And there was no evidence presented at the hearing to suggest that a potential suspect could have entered or exited The Reserve through the 33rd Street entrance during the relevant times. Indeed, Nicholson reviewed footage from multiple security cameras to document every vehicle that could have entered the apartment complex via 31st Street or 33rd Street. And she was able to determine that the robbery suspect did not use the 33rd Street entrance. The Court credits Nicholson's and Padilla's testimony and thus finds that Padilla did not knowingly or recklessly omit the 33rd Street entrance.

### b. Nicholson's Ability to Track the Pontiac

Chaney next argues that the affidavits knowingly or recklessly misrepresented Nicholson's ability to view and track the Pontiac's movements on video surveillance footage. Chaney points to screenshots of video surveillance footage from a camera located on Target's roof and argues that this footage does not allow a clear identification of the Pontiac because the vehicle is too far away from the camera.

The Court agrees that it is difficult to clearly identify the Pontiac in the individual still shots copied in the briefs because they are viewed in isolation. But it is not difficult to identify the Pontiac when the video is viewed in the context of Nicholson's entire investigation. Nicholson thoroughly and methodically reviewed the video surveillance footage from The Reserve, Truity, Casey's, Target, and traffic cameras across Lawrence. She synced the footage from each camera to ascertain timing and referenced other vehicles' movements to track the Pontiac from point-to-point in real time. The Pontiac was not always in camera view, but Nicholson was largely able to

track the Pontiac from one camera to the next between 8:27 a.m. and 9:03 a.m. For example, Target video surveillance captured a dark-colored vehicle traveling north on Neider Road at approximately 8:40 a.m. Although it is difficult to clearly identify the make and model of the vehicle on that footage, Nicholson was able to follow the vehicle as it traveled north until it was captured on Casey's surveillance video a few seconds later. And the footage from Casey's clearly shows that the dark-colored vehicle was the Pontiac. After watching the video during the hearing, the Court was able to follow the footage and path-of-travel of the vehicle. The Court finds that Padilla did not knowingly or recklessly misstate Nicholson's ability to view and track the Pontiac's movements.

### c. Black Sedan

Chaney lastly argues that the affidavits omitted the fact that a newer model black Chevrolet four-door sedan[4] pulled into The Reserve shortly before the robbery and left the complex shortly after the robbery. Chaney contends that this knowing or reckless omission gave the impression that the Pontiac was the only vehicle that could have been involved in the robbery.

The Court again finds that this was not a knowing or reckless omission. Padilla testified that he had no knowledge of any other vehicles being in the area immediately before and after the robbery. Nicholson was aware of the black sedan but quickly ruled it out. She explained that she believed the vehicle to be a Mazda. It arrived at The Reserve approximately 17 minutes before the Pontiac (i.e., 8:47 a.m.) and left The Reserve at approximately 9:39 and 20 seconds. She excluded the black sedan because it left The Reserve while the robbery suspect was still in Truity.

---

[4] Chaney contends that the sedan is a Chevrolet. But Nicholson testified that she believed the vehicle to be a Mazda. She repeatedly demonstrated her ability to identify vehicles and features, and the Court credits her testimony.

11

Chaney questions Nicholson's ability to accurately synchronize The Reserve's video surveillance footage with Truity's video footage. But Nicholson repeatedly demonstrated her ability to synchronize footage from various cameras while she was tracking the Pontiac and discussed her training and the system she used. The Court fully credits her testimony and concludes that Padilla did not knowingly or recklessly omit the existence of a second vehicle in the area around the time of the robbery.

### 2. Materiality

The Court finds that Padilla did not knowingly or recklessly submit misstatements or omit facts. But even if the affidavits contained knowing or reckless misstatements or omissions, the Court finds that they are not material to the probable cause determination. Stated differently, the Court concludes that each magistrate judge would not have altered the probable cause determination when presented with the omitted or corrected facts. *See Moses*, 965 F.3d at 1113. Probable cause would still exist even if Padilla had included facts about The Reserve's second entrance, Nicholson's ability to track the Pontiac, and the black sedan. Nicholson's investigation ruled out the possibility that the robbery suspect used the second entrance. Although the Pontiac was difficult to make out on Target's footage, Nicholson was able to track the Pontiac's movements before and after Target's feed to clearly identify it. And the black sedan left The Reserve while the robbery suspect was still in Truity. Thus, the Court finds that these alleged misstatements and omissions (individually and collectively) were not material to probable cause. Chaney's first argument for suppression is not persuasive.[5]

---

[5] At the hearing Chaney argued for the first time that the affidavits included a fourth knowing or reckless misstatement or omission. Chaney argued that the affidavits misstated that the subject dressed in all black was seen walking to and from the Pontiac before the robbery. Even assuming the argument is timely, the Court finds that this statement is not a knowing or reckless misstatement or omission. First, the Court disagrees with Chaney's interpretation of this statement. Second, read in context (and not in isolation) the detailed factual allegations make clear that video surveillance captured the Pontiac entering The Reserve at 9:03 a.m., a subject dressed in all black emerging from the northeast corner of the complex at 9:06, the robbery suspect exiting Truity at 9:39 and running

B.     **Probable Cause Issue**

Chaney next argues that the search warrants are not supported by probable cause. He specifically argues that: (1) neither warrant is supported by probable cause, and (2) the warrant for his residence lacks a nexus. A reviewing court gives great deference to a search warrant that was reviewed and signed by a judge. *United States v. Duegaw*, 150 F. App'x 803, 805 (10th Cir. 2005). The test for determining whether a search warrant is valid is whether the issuing judge had a "substantial basis" for determining that probable cause existed under the totality of the circumstances presented in the affidavit. *See id.* "To obtain a search warrant, the affidavit must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *Id.* (quotation omitted). Probable cause thus requires a nexus between suspected criminal activity or contraband and the place to be searched. *Id.*

1.     **Probable Cause Linking Chaney to the Robbery**

Chaney first argues that the search warrants lacked probable cause linking him to the robbery. Chaney contends the search warrants were largely based on the facts that he matched the generic description of the robbery suspect and that he was in the area at the time the robbery occurred. He argues these facts do not constitute probable cause.

The Court finds that the affidavits provided each magistrate judge with probable cause to believe that Chaney committed the robbery. The affidavits establish that Chaney owned the Pontiac and that he drives it. The affidavits then establish that the Pontiac arrived in the area around Truity before the robbery and left the area after the robbery. Cameras captured the Pontiac driving

---

towards the northeast corner of the complex, and the Pontiac exiting the complex at 9:41. Although Padilla could have worded it better, it is clear that Padilla was attempting to succinctly summarize these facts in his conclusion and was not trying to misstate that the subject was captured on video surveillance entering or exiting the Pontiac. Third, the government clarified the evidence and statement through Nicholson. Thus, the Court finds that this statement is not a knowing or reckless misstatement or omission. Even if it had been, the Court finds it is not material and that each magistrate judge would still find probable cause.

13

around Truity the day before the robbery, entering Lawrence approximately one hour before the robbery, driving around the business district where Truity is located, and driving to the northeast corner of The Reserve at 9:03 a.m. At 9:06, a subject is captured on camera emerging from the northeast corner of The Reserve and walking across the field that connects to Truity. The robbery suspect enters Truity at 9:37, robs Truity, and leaves at 9:39. The robbery suspect is captured running across the field to the northeast corner of The Reserve. The Pontiac is then seen exiting The Reserve at 9:41. The affidavits further establish that Chaney matched the physical description of the robbery suspect.

These facts provided sufficient probable cause to believe that Chaney committed the robbery. The affidavits contained detailed information linking the Pontiac to the robbery, linking Chaney to the Pontiac, and matching Chaney to the physical description of the robbery suspect.[6] The Court thus finds each magistrate judge had a substantial basis for concluding that probable cause existed.

### 2. Probable Cause Linking the Residence to the Robbery

Chaney next argues that the search warrant for his residence is not supported by probable cause because the affidavit does not establish a nexus between the robbery and the residence. Chaney is correct that an affidavit must contain a nexus between the suspected criminal activity and the place to be searched. *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009). But the affidavit is not required to "draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist." *Id*. A judge may draw their own reasonable conclusions based on the affidavit and "practical considerations of everyday life" in determining

---

[6] Indeed, the affidavits are nearly identical and were considered by different magistrate judges who each found probable cause.

the likelihood that certain evidence will be found at a particular place. *Id*. The Tenth Circuit has identified a non-exhaustive list of factors relevant to the nexus determination, including: "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence." *Id*. at 1279.

The Court finds that the affidavit for the residence established a substantial nexus between the robbery and the 3010 N. 76th Street residence. The affidavit establishes that the Pontiac, which was seen driving to and from the area around the robbery, was registered to Chaney at 3010 N. 76th Street. The affidavit states that investigators used law enforcement resources to determine that Chaney had listed that address as his home address as recently as August 2021. Chaney had listed that address as his residence in a recent unemployment claim. An active tax warrant associated to Chaney also lists this residence as his home address. The affidavit also notes that a week later (September 28) officers observed Chaney leaving 3010 N. 76th Street in the Pontiac and returning to that address in the Pontiac. Padilla states that these facts, and his training and experience investigating crimes as a TFO, lead him to believe evidence of the robbery would be in the residence.

The affidavit does not draw an explicit connection between evidence of the robbery and 3010 N. 76th Street; but an explicit connection is not required. The affidavit instead establishes a nexus between the objects to be seized and the residence that would warrant a reasonable person to believe that the objects would be found at the residence. The warrant stems from an armed robbery. It is a discrete and completed crime. The warrant generally seeks the clothing the robbery suspect was wearing, firearm(s), paperwork for the Pontiac, and currency (including bait bills). These items are personal items that an individual is likely to keep at his or her home in a secured

15

location. The affidavit seeks these items about a week after the robbery, which is sufficient time for a person to transport these items to his or her home and secure them inside (particularly the currency, which a person is unlikely to leave in a vehicle for a week).

The affidavit then connects the robbery suspect to the Pontiac and connects the Pontiac to the residence. The affidavit ties the residence to Chaney as his listed home address and notes that officers observed him leaving and returning to the residence after shopping at Family Dollar. The affidavit also notes that Chaney filed an unemployment claim listing this residence and has a tax warrant associated with him. The affidavit does not include information suggesting that Chaney could store the objects to be seized in other places. For example, the affidavit does not identify other homes recently connected to Chaney, and it is a reasonable inference that Chaney did not have an office where he could have stored these items given the recent unemployment claim. It is also a reasonable inference from the unemployment claim and tax warrant that Chaney was experiencing financial distress around the time of the robbery. *See, e.g.*, *United States v. Barros*, 340 F. App'x 509, 512 (10th Cir. 2009) ("Further investigation indicated Barros was experiencing financial distress around the time of the robbery."). Lastly, the affidavit notes that Padilla believed there is probable cause that the listed items would be at the residence based on his training and experience and based on the evidence gathered during the investigation. Viewing these facts together and considering the non-exhaustive factors identified by the Tenth Circuit, the Court finds that the affidavit establishes a fair probability that the sought items would be found at the residence.[7] *See id.* at 514 (upholding warrant for search of robbery suspect's residence when the

---

[7] For completeness, even if the affidavit lacked a sufficient nexus to the residence, the Court finds that the good faith exception applies. For the same reasons stated above, the affidavit established at least a minimal nexus between the robbery and the residence. Thus, the Court cannot conclude that it was "entirely unreasonable" for the executing officers to rely on the magistrate judge's authorization of the warrant. The good-faith exception thus applies here, and the Court would decline to suppress the evidence seized at the 3010 N. 76th Street residence

application stated the suspect was seen fleeing the scene in a vehicle registered to the suspect at his residence because it was reasonable to believe evidence of the robbery might be found in the residence); *see also United States v. Gonzalez*, 2010 WL 2721882, at *15 (N.D. Ga. 2010) (citing cases finding there was a nexus between robbery suspect and residence).

Chaney heavily relies on *United States v. Mora*, 989 F.3d 794 (10th Cir. 2021). He contends that the affidavit in this case is insufficient under *Mora* because the affidavit fails to provide "specific information linking" the residence to the robbery. But *Mora* is distinguishable. In *Mora*, the defendant was suspected of alien smuggling after dozens of people were seen exiting the back of his tractor trailer behind a supermarket. *Id.* at 797-98. Officers knew that the defendant then parked the tractor trailer at a Walmart, and they apprehended him before he could have brought any items home. *Id.* at 802. The Tenth Circuit held that the affidavit failed to provide a nexus between alien smuggling and the defendant's home. The Tenth Circuit reasoned that alien smuggling is not the type of crime that suggests that evidence would be concealed in the home. And the officers had no reason to believe evidence would be found in the home because the defendant was apprehended before he could hide evidence in his home. *See id.* at 801-02. Chaney's situation is different as the warrant sought personal items likely stored in a home, it sought the items a week later after officers had observed Chaney entering and leaving the residence and the Pontiac, and it included facts suggesting that Chaney did not have another home or office to store the items (e.g., tax warrant and unemployment claim). *See Barros*, 340 F. App'x at 514; *Gonzalez*, 2010 WL 2721882, at *15.

---

on this basis. *See United States v. Ward*, 2015 WL 2018579, at *9 (D. Kan. 2015) (finding good faith applied); *see also United States v. Knox*, 79 F. Supp. 3d 1219 (D. Kan. 2015) (same).

### III. CONCLUSION

The Court carefully considered the evidence and Chaney's arguments on the *Franks* Issue and the Probable Cause Issue. The Court finds that there were no knowing or reckless misstatements or omissions, that any misstatements or omissions were not material, and that the warrants were supported by probable cause. The Court thus denies the motion.

THE COURT THEREFORE ORDERS that Defendant's Motion to Suppress (Doc. 28) is DENIED.

IT IS SO ORDERED.

Dated: March 11, 2022                    /s/ *Holly L. Teeter*
                                         HOLLY L. TEETER
                                         UNITED STATES DISTRICT JUDGE

18